**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| CHABAD OF UNIVERSITY CIRCLE, | ) | |
| | ) | **CASE NO.** 1:26-cv-1779 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CLEVELAND, OHIO, | ) | |
| c/o Director of Law | ) | |
| 601 Lakeside Avenue, Room 106 | ) | |
| Cleveland, OH 44114 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| CLEVELAND BOARD OF ZONING APPEALS, | ) | |
| 601 Lakeside Avenue, Room 516 | ) | |
| Cleveland, OH 44114 | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

**AND JURY DEMAND ENDORSED HEREIN**

Plaintiff Chabad of University Circle ("Chabad" or "Plaintiff"), by and through undersigned counsel, for its Complaint against Defendants City of Cleveland, Ohio (the "City") and the Cleveland Board of Zoning Appeals (the "BZA," and together with the City, "Defendants"), states as follows:

**NATURE OF THE ACTION**

1. For five years, Plaintiff has operated the only synagogue serving the Jewish community of Case Western Reserve University out of a private residence, without ever being cited for a single parking, noise, or other violation. When Plaintiff asked to move next door, into a house it already owns, Defendants refused — on a parking rationale that the Board characterized as "conjecture." The hearing included a resident telling the Board he was afraid to have Plaintiff's

Page 1 of 23

congregants in his neighborhood because "you folks are really violent. You just bombed Iran and killed a whole bunch of folks. So, I'm really scared to have you all in my neighborhood." The City's own Chief City Planner publicly questioning what Plaintiff's "true intention" was in seeking to build a synagogue. No official present repudiated either statement, and the Board denied Plaintiff's application in its entirety.

2. This is a civil rights action for declaratory judgment, injunctive relief, damages, and attorneys' fees and costs, arising from Defendants' denial of Plaintiff's application to use property it owns as a house of worship, in violation of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et seq. ("RLUIPA"), the Free Exercise Clause of the First Amendment to the United States Constitution, and the Equal Protection Clause of the Fourteenth Amendment, the latter two enforced through 42 U.S.C. § 1983.

3. Plaintiff is a Chabad-Lubavitch congregation that has served the Jewish community of Case Western Reserve University ("CWRU") and the surrounding University Circle neighborhood of Cleveland for more than five years out of a private residence, because it has had nowhere else to gather that satisfies both its practical needs and the requirements of Jewish religious law.

4. Plaintiff sought approval to use an existing single-family home it owns next door, at 11409 Wade Park Avenue, Cleveland, Ohio 44106 (the "Property"), as a dedicated house of worship, together with the limited area variances necessary to accommodate that use.

5. Following a public hearing at which the immediate neighbors living beside it for three, five, twelve and one-half, and twenty-one years testified that it had caused no parking, traffic, noise, or other adverse impact, and at which Plaintiff's transportation survey and unrebutted

real-estate testimony corroborated that account, the BZA nonetheless voted 3-1 to deny Plaintiff's application in its entirety.

6. The BZA's stated grounds for denial were not evidence of any adverse impact from Chabad's proposed use, but rather: the political opposition of the local Councilman (based on an undisputedly erroneous belief that Plaintiff had not studied parking impacts, and on the Councilman's unexplained assertion that the synagogue would create "smog"); the unsupported opposition of City planning staff, who by their own admission misunderstood the governing legal standard for much of the hearing; the absence of a discretionary, non-mandatory Landmarks Commission approval; and the BZA's own acknowledgment that its parking concerns were "conjecture."

7. That hearing also included, on the record, a member of the public telling the Board that he feared having Jewish congregants in the neighborhood because "you folks are really violent. You just bombed Iran and killed a whole bunch of folks. So, I'm really scared to have you all in my neighborhood," and the City's own Chief City Planner publicly questioning what Plaintiff's "true intention" was in seeking to build a synagogue — statements that were never repudiated, addressed, or disclaimed by any Defendant official before or after the Board's vote.

8. As a direct and proximate result of Defendants' conduct, Plaintiff remains confined to conducting Sabbath dinners, religious study, and holiday observances inside a private residence that its own religious leadership testified can no longer physically accommodate the congregation, in substantial and ongoing burden of Plaintiff's right to freely exercise its religion.

9. Plaintiff brings this action to vindicate its rights under RLUIPA and the United States Constitution and to obtain the relief necessary to allow it, without further delay, to worship in a manner consistent with its faith.

**JURISDICTION AND VENUE**

10.     This Court has federal-question and civil-rights jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4), because this action arises under RLUIPA, 42 U.S.C. § 2000cc et seq., and 42 U.S.C. § 1983.

11.     This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202, and to award attorneys' fees and costs under 42 U.S.C. § 1988 and 42 U.S.C. § 2000cc-2(g) (incorporating 42 U.S.C. § 1988(b)).

12.     Venue is proper under 28 U.S.C. § 1391(b) because Defendants reside in this judicial district and because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district, in Cuyahoga County, Ohio.

13.     This action is properly assigned to the Eastern Division of this Court because it arises out of events occurring in Cuyahoga County, Ohio.

**PARTIES**

14.     Plaintiff Chabad of University Circle is an Ohio nonprofit corporation that operates a Chabad-Lubavitch congregation serving the Jewish community of CWRU and University Circle, and is a "religious assembly or institution" within the meaning of RLUIPA, 42 U.S.C. § 2000cc(a)(1), (b).

15.     Defendant City of Cleveland, Ohio is a municipal corporation organized under the laws of the State of Ohio. The City is a "government" as that term is defined in RLUIPA, 42 U.S.C. § 2000cc-5(4)(A), and a "person" subject to suit under 42 U.S.C. § 1983 for its official policies, customs, and the acts of its final policymakers.

16.     Defendant Cleveland Board of Zoning Appeals is the administrative body of the City vested with final authority under the City's Codified Ordinances to grant or deny the use

approvals and variances at issue in this case, and is sued in its official capacity as an arm of the City and as a "government" under RLUIPA and a "person" under 42 U.S.C. § 1983 with respect to its own final, non-reviewable legislative and quasi-judicial acts.

17. The BZA is, and at all relevant times was, a final policymaker for the City with respect to the land-use decisions at issue in this case: no further administrative appeal lies from its March 2, 2026 vote, and no other City official or body possessed authority to overrule, revise, or countermand that vote administratively. The BZA's single decision to deny Plaintiff's application therefore constitutes an act of official municipal policy attributable to the City for purposes of 42 U.S.C. § 1983.

18. The statements and conduct of individual City Council members, BZA members, and City planning staff described in this Complaint were made or taken within the scope of their official duties on behalf of the City and the BZA. Those statements and that conduct are alleged herein as evidence of Defendants' policy, custom, and final decision-making, and not as a basis for individual- or personal-capacity liability against any specific officer or employee.

## FACTUAL ALLEGATIONS

### Chabad's Religious Mission and Practice

19. A Chabad house is a synagogue and community center that follows the philosophy of Chabad-Lubavitch, a movement within Orthodox Judaism known for its outreach to Jewish people wherever they live, work, or study.

20. Plaintiff's Chabad is the only synagogue serving the University Circle community, including the CWRU student population.

21. For the past five years, Plaintiff has held Chabad activities in the private home of Rabbi Menachem "Mendy" Alevsky, his wife Sara Alevsky, and their children, located at 1524 East 115th Street, Cleveland, Ohio, immediately adjacent to the Property.

22. Plaintiff hosts Shabbat dinners every Friday night for approximately 40 to 50 people, Bible study sessions several times a week, communal gatherings, and celebrations of major and minor Jewish holidays throughout the year.

23. Jewish religious law prohibits observant Jews from traveling by gas or electric vehicle, and from carrying items outdoors, on the Sabbath and major holidays. As a direct consequence, a synagogue that is not within walking distance of its congregants — and whose religious leadership does not live immediately adjacent to it — cannot function for Sabbath-observant Jews. It is for this reason that, nationwide, the great majority of Chabad houses are located immediately next to, or attached to, the home of the rabbi who leads them.

24. Because Plaintiff's congregation has grown, the Alevskys' private residence can no longer accommodate the number of congregants who wish to attend Sabbath dinners, religious study, and holiday observances.

**The Property and Plaintiff's Application**

25. Plaintiff and related entities own several contiguous and nearby parcels in the immediate vicinity of the Property, including 1516, 1520, and 1524 East 115th Street and 11417 Wade Park Avenue, in addition to the Property itself at 11409 Wade Park Avenue.

26. The Property consists of an existing single-family home of approximately 1,500 square feet, located five feet from its east property line as the home currently sits, in the City's Limited One-Family zoning district and within the Wade Park–Magnolia Historic District.

27.  In late 2025, Plaintiff applied to the City for approval to use the Property as a place of worship, together with a proposed addition to the rear of the existing structure designed by a licensed architect to preserve the historic front-facing appearance of the home and to minimize visual impact from the street.

28.  On December 24, 2025, the City issued Plaintiff a Notice of Non-Conformance denying the application on the ground that it did not comply with provisions of the City's Zoning Code. Plaintiff timely appealed that determination to the BZA the same day.

29.  On January 16, 2026, the City noticed a BZA hearing on Plaintiff's appeal for February 2, 2026. That hearing was postponed at the request of City Councilman Kevin Conwell, and the City subsequently issued a Revised Notice of Non-Conformance adding a third Zoning Code provision that had not been identified in the original notice. The BZA hearing was then renoticed for, and held on, March 2, 2026.

30.  As clarified at the March 2, 2026 hearing, Plaintiff required three approvals from the BZA to proceed with its proposed house of worship: (a) approval to use the Property as a place of worship under Codified Ordinance § 337.01(a)(2), which permits places of worship in the Limited One-Family District "if permitted by the Board of Zoning Appeals after public notice and public hearing under appropriate safeguards and such special conditions as the Board deems necessary," and "if in the judgment of the Board" the proposed use is "appropriately located and designed" and "will meet a community need without adversely affecting the neighborhood" (the "Use Approval"); (b) an area variance from Codified Ordinance § 349.04, which would otherwise require 22 off-street parking spaces, to permit Plaintiff to provide the parking already available through on-street parking, an adjoining driveway, and a nearby university parking garage (the

"Parking Variance"); and (c) an area variance from the 15-foot setback requirement in Codified Ordinance § 337.02(f)(1) to accommodate the proposed rear addition (the "Setback Variance").

31.    Codified Ordinance § 337.01(a)(2) requires no comparable discretionary "community need" or "adverse effect" showing, and imposes no comparable individualized permitting process, for uses other than places of worship and similar institutional uses that are otherwise permitted by right in the Limited One-Family District.

**The Undisputed Evidence at the March 2, 2026 Hearing Favored Approval**

32.    At the outset of the hearing, the City's own legal counsel and planning staff repeatedly, and incorrectly, characterized Plaintiff's request as a "use variance" requiring a showing of "unnecessary hardship," rather than the lesser, non-hardship standard that in fact governed Plaintiff's request for Use Approval under § 337.01(a)(2). That confusion, generated by the City's own representatives, was never fully corrected and pervaded the testimony of objecting members of the public and City staff throughout the remainder of the hearing.

33.    Rabbi Alevsky testified, without contradiction, that Chabad attendees overwhelmingly walk to services rather than drive, both because most live within walking distance and because Jewish law prohibits driving on the Sabbath; that a survey of 91 members of the community found that approximately 80% do not own a car and approximately 76% walk to Chabad events; that the existing Chabad operation has never received a parking or noise complaint or violation in five years; and that public, on-street parking is separately available on Wade Park Avenue after 6:00 p.m. and on East 115th Street.

34.    Multiple immediate neighbors of the existing, five-year Chabad operation — including residents who had lived next door for three, five, twelve and one-half, and twenty-one years, respectively — testified from personal knowledge that Chabad had never caused any

parking, noise, loitering, or littering problem, and that its presence had been a positive addition to the neighborhood.

35.     A real estate agent testified, without contradiction from any witness with relevant expertise, that property values are affected only positively by proximity to a synagogue, and even objectors to the application conceded that the proposed Chabad would increase, not decrease, neighboring property values.

36.     The City's own Chief Zoning Administrator confirmed at the hearing that a place of worship is a use the BZA may permit under § 337.01(a)(2), and that if Plaintiff ever sold the Property, its use would revert to a place of worship or a single-family residence and would require further BZA approval for any other use — directly refuting objectors' speculation about future commercial or institutional uses of the Property.

37.     Plaintiff's architect, who has practiced for three decades and worked on the project for approximately ten years, testified and submitted documentary evidence that every other existing house of worship in the surrounding neighborhood is likewise located within fifteen feet of adjoining residential property such that Plaintiff's request "does not feel out of context with the surrounding neighborhood whatsoever."

38.     The City's Landmarks Commission, though it had not yet formally acted (and formal Landmarks approval is not a prerequisite to Use Approval under § 337.01(a)(2)), had reviewed the design in multiple iterations and complimented the most recent, reduced-scope design, raising only minor concerns about window proportions and paint color.

39.     Multiple members of the CWRU Jewish student community testified that Chabad is the only synagogue available to them, that they have no other place near campus to worship or be religiously observant, and that Chabad provides them a place to "be Jewish without

experiencing anti-Semitism." Two members of the BZA itself expressly acknowledged, on the record, that no one disputed the community's need for the proposed Chabad.

40.     Plaintiff offered to accept conditions restricting the Property's use to Chabad activities serving the CWRU community and prohibiting any sale, expansion, or change in use without further BZA approval.

**Discriminatory Statements and Political Pressure Infected the Proceeding**

41.     During public comment, a member of the public opposing the application told the Board, on the record: "I'm just speaking from a personal point of view, a fear point of view. You folks are really violent. You just bombed Iran and killed a whole bunch of folks. So, I'm really scared to have you all in my neighborhood." No BZA member, City staff member, or City legal counsel present at the hearing repudiated, struck, or otherwise addressed this statement, which invoked geopolitical events having nothing to do with Plaintiff or its congregation to invite the Board to associate Plaintiff's Jewish congregants with violence.

42.     Also during the hearing, the City's own Chief City Planner, Kim Scott, publicly questioned what Plaintiff's "true intention" was in seeking to build the proposed Chabad, without articulating any legitimate zoning-related basis for that suspicion and without any evidentiary support in the record.

43.     City Councilman Kevin Conwell announced his opposition to the application based on his view that it would create "smog" and his assertion that Plaintiff had not conducted a "parking study," notwithstanding Plaintiff's Transportation Survey documenting overwhelmingly pedestrian attendance, and notwithstanding the absence of any evidence connecting the Chabad's historical operation to any parking or traffic problem.

44. The BZA's own planning department staff, including Ariel Washington and Xavier Bay, repeatedly mischaracterized Plaintiff's Use Approval request as a rezoning or use variance even after the correct legal standard had been identified on the record, contributing to a hearing in which a majority of public objectors likewise, incorrectly, believed they were opposing a variance or rezoning rather than a use the Zoning Code already permits, subject only to the BZA's satisfaction of the location, community-need, and neighborhood-impact criteria of § 337.01(a)(2).

45. At the close of the hearing, BZA Member Faith moved to deny the application, notwithstanding her express, on-the-record acknowledgment that "we understand that there's a need for this in the community," citing as grounds for denial: the Councilman's lack of support; the City planning department's lack of support; the absence of Landmarks Commission approval (which is not required by § 337.01(a)(2)); a parking concern that the same Board member characterized as "conjecture"; the limited time Plaintiff had to meet with the public; and Plaintiff's unwillingness to accept only a temporary use approval (a condition it explained would make the project impossible to finance).

46. The Board did not merely permit the statements described above to go unanswered; it adopted as its own the positions of the officials and members of the public who made them. Each of the three affirmative grounds on which the Board relied was a direct conduit for those statements: the "lack of support" from the Councilman was the opposition of the same official who justified that opposition by reference to "smog" and to a parking study that in fact existed; the "lack of support" from the City planning department was the position of the same department whose Chief City Planner had publicly questioned Plaintiff's "true intention" in seeking to build a synagogue; and the "limited time" Plaintiff had spent with the public referred to the same body of public comment that included a resident's statement that he feared Plaintiff's congregants because

of a geopolitical conflict involving Israel. In relying on those three grounds, the Board incorporated into its decision the animus that produced them.

47. Not one of the grounds cited by the Board in its motion to deny identified any competent evidence of an actual adverse effect of the proposed Chabad on traffic, parking, noise, property values, or the character of the neighborhood — the only criteria that Codified Ordinance § 337.01(a)(2) makes relevant to the Board's decision.

48. The BZA voted 3-1 to deny Plaintiff's appeal in its entirety, denying the Use Approval, the Parking Variance, and the Setback Variance. Board Member Rocha cast the sole vote against denial.

49. At the same March 2, 2026 meeting at which it denied Plaintiff's application, the BZA unanimously approved (a) an appeal to use a building in a Local Retail Business District as an event and catering facility, a use not otherwise permitted in that district, whose proponent disclosed irregular hours of operation extending to 11:00 p.m.; and (b) an appeal to convert a single-family home into a Class 2 residential care facility, notwithstanding two petitions in opposition from neighboring residents and the written opposition of the area's City Council Member. The Board approved both secular applications notwithstanding the presence of considerations of the very kind it invoked, at the same session, as grounds to deny Plaintiff's.

**The BZA's Formal Decision and the Pending State Court Appeal**

50. On March 9, 2026, the BZA adopted written Resolution No. 25-243 memorializing the denial, and on March 11, 2026, the City issued its formal Notice of Decision.

51. On March 26, 2026, Plaintiff timely filed a Notice of Appeal and Praecipe with the Court of Common Pleas of Cuyahoga County, Ohio, Case No. CV-26-135814, pursuant to Ohio Revised Code Chapter 2506, challenging the BZA's decision as unsupported by a preponderance

of the substantial, reliable, and probative evidence in the administrative record and as illegal, arbitrary, capricious, and unreasonable under Ohio law. That appeal remains pending.

52.  The pending Chapter 2506 appeal presents questions of Ohio administrative and zoning law regarding the sufficiency of the evidentiary record before the BZA. It does not present, and the Cuyahoga County Court of Common Pleas sitting in its R.C. 2506 appellate capacity is not the appropriate forum to adjudicate in the first instance, Plaintiff's independent federal statutory and constitutional claims under RLUIPA, the First Amendment, and the Fourteenth Amendment. Plaintiff brings those federal claims in this separate action, which Plaintiff intends to prosecute concurrently with, and not in lieu of, the pending state court appeal.

53.  No doctrine of abstention or comity warrants this Court declining to exercise the jurisdiction Congress has conferred on it. The pending Chapter 2506 appeal is a civil proceeding initiated by Plaintiff itself; it is not a state criminal prosecution, a civil enforcement proceeding akin to a criminal prosecution, or a proceeding uniquely in furtherance of a state court's ability to perform its judicial function. Nor does that appeal afford Plaintiff an adequate opportunity to vindicate the federal rights asserted here: a Chapter 2506 appeal is confined to review of the administrative record compiled before the BZA, and affords Plaintiff no discovery, no opportunity to develop evidence of Defendants' comparative treatment of secular assemblies and non-Jewish houses of worship, and no remedy in damages, expert fees, or attorneys' fees under RLUIPA or 42 U.S.C. § 1988.

54.  The BZA's March 2, 2026 decision is a final decision within the meaning of RLUIPA, 42 U.S.C. § 2000cc-2, and 42 U.S.C. § 1983: it represents the final word of the government body responsible for granting or denying Plaintiff's requested land-use approvals, no further administrative appeal lies from that decision, and Defendants possess no further discretion

to grant Plaintiff's application administratively. RLUIPA claims are not subject to any requirement of exhaustion of administrative or judicial remedies. See 42 U.S.C. § 2000cc-2(e).

**Ongoing and Irreparable Harm**

55.     As a direct and proximate result of Defendants' denial, Plaintiff remains confined to using the Alevskys' private residence for Sabbath dinners, religious study, and holiday observances, notwithstanding the undisputed testimony of Plaintiff's own religious leadership that the residence can no longer physically accommodate the congregation.

56.     The denial has forced Plaintiff to continue operating in a manner that does not allow it to fully practice and grow its religious mission, and every day that Defendants' unlawful denial remains in effect inflicts an ongoing, irreparable injury to Plaintiff's right to freely exercise its religion that cannot be remedied by money damages alone.

57.     Plaintiff has no adequate remedy at law.

## CAUSES OF ACTION

## COUNT 1

**RLUIPA – Substantial Burden on Religious Exercise, 42 U.S.C. § 2000cc(a)(1)**

58.     Plaintiff incorporates by reference each of the foregoing paragraphs as if fully rewritten herein.

59.     RLUIPA provides that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution," unless the government demonstrates that imposition of the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc(a)(1).

60.     Section 2000cc(a)(1) applies here because the land use regulation at issue involves a system of individualized assessments in which the government may take into account the particular details of a proposed use of property. 42 U.S.C. § 2000cc(a)(2)(C). Codified Ordinance § 337.01(a)(2) constitutes such a system: on its face, it conditions the operation of a place of worship in the Limited One-Family District on whether, "in the judgment of the Board," the proposed use is "appropriately located and designed" and "will meet a community need without adversely affecting the neighborhood" — individualized, discretionary determinations made on a case-by-case basis.

61.     Section 2000cc(a)(1) applies independently because the substantial burden Defendants have imposed affects, and its removal would affect, commerce among the several States. 42 U.S.C. § 2000cc(a)(2)(B). Plaintiff solicits and receives charitable contributions from donors located outside Ohio; serves a student and visitor population that travels across state lines to attend its services, meals, and programs; purchases religious articles, food, and supplies that move in interstate commerce; and, but for Defendants' denial, would have contracted for construction services and purchased building materials in interstate commerce to construct the proposed addition to the Property.

62.     The denial of the Use Approval, Parking Variance, and Setback Variance imposes a substantial burden on Plaintiff's religious exercise. Absent those approvals, Plaintiff cannot use the only property it owns that is suitable, under its faith's prohibition on Sabbath travel and carrying, to serve as a synagogue within walking distance of its congregation, and Plaintiff has no other adequate, feasible, or religiously acceptable alternative location for its congregation.

63.     Defendants cannot demonstrate that the denial furthers any compelling governmental interest. The record before the BZA contained no competent evidence that Plaintiff's

proposed use would adversely affect traffic, parking, noise, property values, or the character of the neighborhood; to the contrary, the only direct evidence in the record — from Plaintiff's architect, its Transportation Survey, its immediate neighbors of five, twelve, and twenty-one years, and the City's own Chief Zoning Administrator — established the absence of any such effect.

64.     Even if Defendants could identify a compelling interest, the wholesale denial of Plaintiff's application was not the least restrictive means of furthering it, particularly where Plaintiff offered to accept use restrictions and other conditions the BZA is empowered to impose under § 337.01(a)(2) and Plaintiff's Parking Variance request was supported by unrebutted evidence that on-site and nearby parking already exceeds actual, religiously-driven demand.

65.     As a direct and proximate result of Defendants' violation of 42 U.S.C. § 2000cc(a)(1), Plaintiff has suffered and continues to suffer irreparable harm to its right to freely exercise its religion, entitling Plaintiff to declaratory and injunctive relief, damages, and its attorneys' fees and costs pursuant to 42 U.S.C. § 2000cc-2(g).

## COUNT 2

**RLUIPA – Nondiscrimination on the Basis of Religion, 42 U.S.C. § 2000cc(b)(2)**

66.     Plaintiff incorporates by reference each of the foregoing paragraphs as if fully rewritten herein.

67.     RLUIPA provides that "[n]o government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2).

68.     Defendants discriminated against Plaintiff on the basis of religion and religious denomination by denying the application of the only Jewish congregation in University Circle for approval to operate a house of worship, on an evidentiary record establishing no adverse impact,

while houses of worship of other faiths and denominations operate throughout the immediately surrounding neighborhood — each, according to the documentary evidence before the Board, within fifteen feet of adjoining residential property, the same or a more severe condition than the one on which Defendants denied Plaintiff relief — without the City requiring their removal or curtailment or subjecting them to the conditions demanded of Plaintiff.

69.     The proceeding that produced the denial was infected by hostility to Plaintiff's congregants on the basis of their religious and denominational identity, and the Board did not merely fail to disclaim that hostility — it relied on it. The Board expressly grounded its denial on the opposition of Councilman Conwell, whose stated objections were the demonstrably false assertion that Plaintiff had conducted no parking study and the unexplained assertion that a synagogue would generate "smog"; on the opposition of the City planning department, whose Chief City Planner had publicly questioned Plaintiff's "true intention" in seeking to build a synagogue without any evidentiary basis for that suspicion; and on Plaintiff's asserted failure to spend sufficient time with a public whose comment at the hearing included a resident's statement that he feared having Plaintiff's congregants in the neighborhood because "you folks are really violent. You just bombed Iran and killed a whole bunch of folks. So, I'm really scared to have you all in the neighborhood." No City or BZA official disclaimed, addressed, or repudiated any of those statements at any point before the Board voted to deny Plaintiff's application.

70.     The BZA's stated reasons for denial — political opposition from the Councilman, unsupported opposition from planning staff who misapplied the governing legal standard, and parking concerns the Board itself characterized as conjecture — were pretextual and did not reflect the genuine, evidence-based application of neutral zoning criteria to Plaintiff's proposal.

71.     As a direct and proximate result of Defendants' violation of 42 U.S.C. § 2000cc(b)(2), Plaintiff has suffered and continues to suffer irreparable harm, entitling Plaintiff to declaratory and injunctive relief, damages, and its attorneys' fees and costs pursuant to 42 U.S.C. § 2000cc-2(g).

## COUNT 3

### RLUIPA – Equal Terms, 42 U.S.C. § 2000cc(b)(1)

72.     Plaintiff incorporates by reference each of the foregoing paragraphs as if fully rewritten herein.

73.     RLUIPA provides that "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1).

74.     Codified Ordinance § 337.01(a)(2) lists, as uses permitted in the Limited One-Family District, "Schools, dormitories constructed or operated by an existing permitted school, libraries or museums and police protective facilities therefor, providing they are not conducted as a gainful business, places of worship, if permitted by the Board of Zoning Appeals." By its terms, the condition of Board permission and the "community need" and "adverse effect" criteria follow, and attach to, the phrase "places of worship," while the secular schools, dormitories, libraries, and museums that precede that phrase are listed without any such condition. On information and belief, Defendants construe and implement § 337.01(a) consistently with that text, permitting secular schools, dormitories, libraries, and museums in the district without the discretionary community-need showing they demanded of Plaintiff.

75.     Independently, and in any event, Defendants have implemented the City's zoning scheme in a manner that treats Plaintiff on less than equal terms with nonreligious assemblies and

institutions. Secular assembly and institutional uses operate in and immediately surrounding the district and adjacent to the Property — including a music school and a daycare facility, each of which gathers members of the public for regular, scheduled group activity in a comparable residential setting, as well as a university residence hall, a university athletic field, and a university parking garage — without having been subjected to the denial of use, the off-street parking burden, or the conditions Defendants imposed on Plaintiff. Defendants' unequal implementation is further evidenced by the Board's conduct at the very meeting at which it denied Plaintiff's application, when it unanimously approved the two secular applications described above notwithstanding the presence of the same categories of considerations — a use not otherwise permitted in the district, parking limitations, neighborhood opposition, and the opposition of the area's Council Member — that the Board cited as grounds to deny Plaintiff. Discovery is likely to identify additional similarly situated secular assemblies or institutions that were treated, or would be treated, on more favorable terms than Plaintiff.

76.     As a direct and proximate result of Defendants' violation of 42 U.S.C. § 2000cc(b)(1), Plaintiff has suffered and continues to suffer irreparable harm, entitling Plaintiff to declaratory and injunctive relief, damages, and its attorneys' fees and costs pursuant to 42 U.S.C. § 2000cc-2(g).

### COUNT 4

#### First Amendment – Free Exercise Clause (42 U.S.C. § 1983)

77.     Plaintiff incorporates by reference each of the foregoing paragraphs as if fully rewritten herein.

78.     The Free Exercise Clause of the First Amendment, applicable to Defendants through the Fourteenth Amendment, protects the right to gather for communal worship and

religious instruction, prohibits government action that burdens religious exercise pursuant to a system that invites the government to make individualized, discretionary judgments about the reasons for or exceptions to particular land uses, and independently prohibits government action motivated by hostility to, or targeting of, a particular religion.

79.     Codified Ordinance § 337.01(a)(2) is not a neutral law of general applicability as applied to Plaintiff; it commits to the BZA's individualized discretion whether a particular place of worship will be permitted to operate, based on standards — "community need" and "adverse effect on the neighborhood," as assessed "in the judgment of the Board" — that invite exactly the kind of individualized, subjective assessment that the First Amendment does not permit the government to apply to burden religious exercise without satisfying strict scrutiny.

80.     Independently, Defendants' denial of Plaintiff's application was motivated, at least in part, by hostility toward Plaintiff's religious identity. The Board did not simply allow expressions of that hostility to pass unanswered; it adopted the positions of the officials and members of the public who voiced them. The Board's stated grounds for denial were the Councilman's opposition, the planning department's opposition, and the sufficiency of Plaintiff's engagement with the objecting public — the three channels through which the statements described in paragraphs 41 through 43 above reached the Board — while the Board identified no competent evidence of adverse impact from Plaintiff's proposed use.

81.     Defendants' denial of Plaintiff's application cannot survive strict scrutiny for the same reasons set forth in Count 1, above.

82.     As a direct and proximate result of Defendants' violation of the Free Exercise Clause, Plaintiff has suffered and continues to suffer irreparable harm, entitling Plaintiff to

declaratory and injunctive relief, damages, and its attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT 5

**Fourteenth Amendment – Equal Protection Clause (42 U.S.C. § 1983)**

83. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully rewritten herein.

84. The Equal Protection Clause of the Fourteenth Amendment prohibits government action that treats similarly situated persons or institutions differently on the basis of religion, or that is motivated by religious animus, without satisfying strict scrutiny.

85. Plaintiff is similarly situated to the non-Jewish houses of worship operating in the surrounding neighborhood with the same or more severe nonconformities with the applicable setback requirement, and to the secular assembly and institutional uses — including the music school, daycare facility, and university residential, athletic, and parking facilities — operating in and immediately surrounding the district without comparable burdens.

86. Defendants treated Plaintiff differently from those similarly situated comparators by denying Plaintiff's application notwithstanding an evidentiary record showing no adverse impact, and did so, at least in part, because of Plaintiff's religious identity. The Board's reliance on the Councilman's political opposition, on the planning department's opposition, and on the adequacy of Plaintiff's engagement with the objecting public — rather than on the neutral criteria the Zoning Code actually requires it to apply — incorporated into the Board's decision the animus expressed through each of those channels, and stands in unexplained contrast to the Board's same-day approval of the secular applications described above.

87.     Defendants' differential treatment of Plaintiff cannot survive strict, or even rational-basis, scrutiny, because it bears no relationship — let alone a substantial or narrowly tailored one — to any legitimate governmental interest supported by the evidence in the record.

88.     As a direct and proximate result of Defendants' violation of the Equal Protection Clause, Plaintiff has suffered and continues to suffer irreparable harm, entitling Plaintiff to declaratory and injunctive relief, damages, and its attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Chabad of University Circle respectfully requests that this Court enter judgment in its favor and against Defendants, and grant the following relief:

A. A declaratory judgment that Defendants' denial of Plaintiff's application for the Use Approval, Parking Variance, and Setback Variance violates RLUIPA, 42 U.S.C. § 2000cc(a)(1), (b)(1), and (b)(2); the Free Exercise Clause of the First Amendment; and the Equal Protection Clause of the Fourteenth Amendment;

B. A preliminary and permanent injunction ordering Defendants to grant Plaintiff the Use Approval, Parking Variance, and Setback Variance necessary to use the Property as a house of worship, or, in the alternative, ordering Defendants to reconsider Plaintiff's application under a constitutionally and statutorily compliant process free of the discriminatory and pretextual influences described herein;

C. An award of compensatory damages in an amount to be determined at trial;

D. An award of nominal damages;

E. An award of reasonable attorneys' fees, expert fees, and costs pursuant to 42 U.S.C. § 1988(b) and 42 U.S.C. § 2000cc-2(g);

F. Pre-judgment and post-judgment interest as permitted by law; and

G.  Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable pursuant to Federal Rule of

Civil Procedure 38(b).


Respectfully submitted,

JEWISH COMMUNITY ADVOCACY COUNCIL

Jonathan Gross (N.D. Ohio Bar ID: MD19121701)
LAW OFFICE OF JONATHAN GROSS
2833 Smith Ave., Suite 331
Baltimore, MD 21209
Tel: (443) 813-0141
jonathansgross@gmail.com

/s/ Mark L. Javitch
Jewish Community Advocacy Center
Mark L. Javitch (Cal. Bar No. 323729)
(pro hac vice application forthcoming)
JAVITCH LAW OFFICE
3 East 3rd Ave., Ste. 200
San Mateo, CA 94401
Tel: (650) 781-8000
mark@javitchlawoffice.com

*Attorneys for Plaintiff Chabad of University Circle*